## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| RAYMOND CAHNMAN, Derivatively on Behalf of Nominal Defendant STERLING BANCORP, INC., | Case No. 2:22-cv-10124 |
| Plaintiff, | |
| v. | |
| BARRY ALLEN, PEGGY DAITCH, SETH MELTZER, SANDRA J. SELIGMAN, PETER SINATRA, RACHEL TRONSTEIN STEWART, and LYLE WOLBERG, | |
| Defendants, | |
| and | |
| STERLING BANCORP, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Raymond Cahnman ("Plaintiff"), by and through the undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Sterling Bancorp, Inc. ("Sterling" or the "Company") against certain current and former members of its

Board of Directors (the "Board") (the "Individual Defendants," as defined below) seeking to remedy the Individual Defendants' misconduct alleged herein.

## SUMMARY OF THE ACTION

1.     Sterling is a Detroit-area bank whose long-tenured directors and executive officers nearly sunk the Company by chasing California dreams. Desiring to grow the Company, Sterling's leadership shifted the bank's operations—but not its headquarters—away from the local Michigan populace that the Company had served for more than two decades to the rapidly developing markets of Silicon Valley, Greater Los Angeles, and eventually New York and Seattle.

2.     To make inroads into these promising markets, Sterling developed the Advantage Loan Program ("ALP"), through which the Company offered residential mortgages to borrowers in underserved communities who were unable to demonstrate good credit by traditional means.  Soon, the ALP loan became Sterling's most popular and profitable product.  In November 2017, the Seligman family, which controlled the Company, took Sterling public.  The Seligmans retained a controlling position, and enticed public investors by touting the exceptional financial performance of the ALP.  In just a few years, Sterling had more than doubled its loan originations and deposits, and in markets where the ALP was especially successful, rapid growth was underway.

3.     The combination of escalating expansion thousands of miles from home and best-in-class expense-to-income efficiency seemed too good to be true. In fact it was, as the ALP was revealed to be a program by which loan officers and top executives enriched themselves by facilitating fraud in the low-document mortgage application process.

4.     As directed and encouraged by the most senior officers of the Company, including the Company's founder and largest stockholder Scott J. Seligman ("Scott Seligman"), employees in California and New York skirted the Company's underwriting guidelines—weakly enforced by middle managers in Michigan—to originate thousands of residential loans to unqualified borrowers for the purpose of laundering money or evading taxes.

5.     Sterling's primary federal regulator, the Office of the Comptroller of the Currency (the "OCC"), notified Sterling that the Company's internal controls appeared inadequate and that the OCC suspected the ALP was being utilized to violate anti-money-laundering laws.   However, Sterling failed to address the deficiencies and continued to issue inaccurate disclosures regarding its financial performance and operational risk.

6.     Sterling revealed the truth about the ALP slowly, and only at the continued prodding of the OCC and irate stockholders.  For the next year-and-a-

half the ALP continued running at full speed, generating new residential loans to sell on the secondary market or prop up the Company's income statement.

7.     On December 9, 2019, Sterling suddenly announced the suspension of the program, in conjunction with an internal review of loan documentation and compliance with Sterling's loan origination policies.  Thus began a steady drip of incomplete disclosures regarding the true nature of the ALP, directors' and officers' lack of oversight, and the financial health of the Company.  Each successive revelation, especially the March 6, 2020 decision to shut down the ALP permanently, triggered a massive drop in the market price of the Company's common stock.

8.     The stock did not begin to recover until November 9, 2020, when the Company filed with the United States Securities and Exchange Commission (the "SEC") its long overdue annual report for the year ended December 31, 2019.  In the interim, Sterling endured a bevy of director and officer departures and an investigation by the United States Department of Justice ("DOJ") that has led to three arrests and remains ongoing.

9.     Plaintiff brings this derivative action on behalf of the Company for the purpose of obtaining redress for breaches of fiduciary duties by certain directors and officers of the Company.  Plaintiff alleges that those defendants abdicated their

responsibility to make a good faith effort to oversee the Company's operations, internal controls, and accounting and financial reporting practices.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interest and costs. The Company's officers and directors transact business in this judicial district and are subject to its personal jurisdiction. This action is not a collusive one to confer jurisdiction this Court otherwise would lack.

11.     This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)-(c), as a substantial part of the events and omissions giving rise to this action occurred in this district.

## PARTIES

13.     Plaintiff, a citizen of Illinois, is a shareholder of Sterling and has been a shareholder of Sterling continuously since November 2017.

14.     Defendant Sterling, a Michigan corporation headquartered in Southfield, Michigan, is a citizen of Michigan. Sterling is a unitary thrift holding company incorporated in 1989. Sterling's primary business is the operation of its

wholly-owned subsidiary, Sterling Bank & Trust, F.S.B. ("Sterling Bank"), through which Sterling offers a range of loan products to residential and commercial markets, as well as retail banking services.   Although Sterling is headquartered in Southfield, Michigan, 26 of Sterling Bank's 30 branches are located in California.   Sterling stock trades on the NASDAQ exchange under the ticker symbol "SBT."

15.   Defendant Barry Allen ("Allen"), a citizen of Florida, is a former certified public accountant that served as a director of the Company from 1998 until his resignation on December 31, 2020.   The Company routinely cited his "extensive experience in the business and financial world, as well as his particular expertise in accounting and management issues," including his certification as a public accountant and his 12 years as regional managing partner, owner, member of the management committee, and director of public accounting and consulting firm Baker Tilly Virchow Krause, LLP ("Baker Tilly"), as reasons he should serve as a Company director.   He was chairman of the Board's Audit and Risk Management Committee (the "Audit Committee") from its inception until his departure from the Company.

16.   Defendant Peggy Daitch ("Daitch"), a citizen of Michigan, has been a director of the Company since December 17, 2019.   She is one of Michigan's

leading philanthropic consultants and serves alongside Sandra Seligman on the boards of numerous charities sponsored by the Seligman Family Foundation.

17.    Defendant Seth Meltzer ("Meltzer"), a citizen of Michigan, has been a director of the Company since 2000.  He is the son of fellow director-defendant Sandra J. Seligman ("Sandra Seligman").  The Company's public filings state that the Board "believes that Mr. Meltzer should serve as a director because of his investment expertise and deep historical knowledge of the Company."  Meltzer chairs the Board's Asset Liability Committee and, until March 2021, served on the Board's Nominating Committee.  Along with his mother, Sandra Seligman, and his uncle, Scott Seligman, Meltzer serves on the Board of Trustees of the Seligman Family Foundation, the recipient of numerous large donations from Sterling until a change in Company policy in June 2020.

18.    Defendant Sandra Seligman, a citizen of Michigan, is Sterling's longest-serving director, having joined the Board at the Company's founding in 1984.  Her son is fellow director-defendant Meltzer.  Her brother is Sterling founder Scott Seligman.  Until August 2020, when the siblings stopped utilizing the same trustee for their respective trusts, Scott Seligman was the primary family representative of the various family trusts that together constituted Sterling's controlling shareholders.  Since that time, the trustee of the trusts for the benefit of Sandra Seligman has held voting and dispositive power over approximately 18% of

Sterling common stock.   The Company's public filings state that the Board "believes that Ms. Seligman should serve as a director because of her long term commitment to and experience with the Company."   Until March 2021, Sandra Seligman served on Sterling's Nominating Committee.   Along with her son, Meltzer, and her brother, Scott Seligman, Sandra Seligman serves on the Board of Trustees of the Seligman Family Foundation, the recipient of numerous large donations from Sterling until a change in Company policy in June 2020.

19.   Defendant Peter Sinatra ("Sinatra"), a citizen of California, joined the Board in 2008.  Sinatra resigned from the Company in December 2020.

20.   Defendant Rachel Tronstein Stewart ("Stewart"), a citizen of Michigan, served on the Board from 2018 until the expiration of her term on December 4, 2020.  She opted not to seek re-election, citing "personal reasons." She was a member of the Audit Committee for the duration of her tenure with the Company.

21.   Defendant Lyle Wolberg ("Wolberg"), a citizen of Michigan, joined the Board in August 2017.  He has been a member of the Audit Committee for the duration of his tenure with the Company.

22.   Collectively, defendants Allen, Daitch, Meltzer, Sandra Seligman, Sinatra, Stewart, and Wolberg are referred to herein as "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

23.    By reason of their positions as directors of Sterling, and because of their ability to manage the business and corporate affairs of the Company, the Individual Defendants owed Sterling and its shareholders fiduciary obligations of good faith, loyalty, and candor.  They were required to use their utmost ability to manage Sterling in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Sterling and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director of the Company owed to Sterling and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company.

24.    The Individual Defendants, because of their positions of authority as directors of Sterling, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their managerial and directorial positions with Sterling, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

25.    To discharge their duties, the directors of Sterling were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the directors of Sterling were required to exercise good faith to ensure that the Company was

operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements.  When put on notice of problems with the Company's business practices and operations, the Individual Defendants were required to exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## FACTUAL ALLEGATIONS

### Overview of the Company

26.     Sterling's primary business is the operation of its wholly-owned subsidiary, Sterling Bank, which was founded by Scott Seligman as a federally chartered thrift institution in 1984.  At all times prior to August 19, 2020, the Seligman family held a majority, controlling interest in the Company.  More than 50% of the Company's outstanding voting power was held by Scott Seligman and a collection of trusts established for the benefit of the Seligman family.  Via his voting stake, his role as the Company's Vice President, and his service as a Board advisor—which included attendance at Board meetings and frequent consultation with senior management—Scott Seligman was able to control the overall management and direction of the Company.

27.     In its first three decades, Sterling evolved from a local bank operating in the Detroit metro area to a corporation headquartered in Michigan but nearly exclusively serving fast-growing markets in California.  In 1994, Sterling opened

its first branch in San Francisco.  Ten years later, Sterling sold all but one of its Michigan branches.  In 2006, Sterling substantially reduced new lending in its home state.  By 2013, Sterling operated 16 branches, almost all in the San Francisco Bay area.

28.    The shift in focus from Detroit to Silicon Valley considerably improved the Company's purported credit quality.  Sterling's ratio of non-performing assets to total assets declined from 5.7% in 2008 to 0.93% in 2013.

29.    Having struck gold in San Francisco, Sterling sought expansion to additional growing markets.  In 2015 the Company opened a loan production office near Los Angeles.  By late 2017, Sterling was operating 26 branches—20 in the Bay area, 4 in Greater Los Angeles, one in New York City, and its headquarters in Michigan—and planned to open two more branches in Los Angeles and a full branch in Seattle by early 2018.

30.    According to the Company's filings, the fast buildout was wildly successful.  Between 2013 and September 30, 2017, Sterling nearly tripled its assets—from $984 million to $2.636 billion—while its portion of non-performing assets steadily declined to just 0.15%.  Net income increased at a similar rate, from $14.5 million in 2013 to $38.0 million in 2017.  Residential mortgages, comprising more than 80% of the Company's overall loan portfolio, drove most of the growth.

**Sterling's Disclosures Regarding the ALP in Support of Its IPO**

31.    On November 17, 2017, Sterling conducted an initial public offering of 15 million shares (the "IPO").  The IPO included 7,307,692 shares from selling shareholders, a group exclusively comprised of Meltzer and various Seligman family trusts.   Together, they held approximately 99.6% of Company shares. Sterling structured the IPO such that the Seligmans and their trustee would retain approximately 67.2% of voting power in the Company.

32.    In its prospectus filed with the SEC on November 17, 2017 in support of the IPO ("the Offering Statement"), the Company acknowledged that the Seligmans would "have the ability to influence Company operations and control the outcome of matters submitted for shareholder approval and may have interests that differ from those of our other shareholders."  Because Sterling would remain a controlled company, prospective investors would not be able to affect Sterling's operations inconsistent with the Seligmans' wishes.   Sterling enticed new shareholders with financial disclosures regarding the strength of the Company's loan portfolio and the success of the ALP.

33.    Through the ALP, Sterling offered adjustable-rate mortgages for terms of one, three, five, or seven years, to customers with limited credit histories who made a 35% down payment.  Sterling offered lower rates to customers making larger down payments.

34.     The ALP was incredibly popular and the source of much of the Company's growth.  In the Offering Statement, Sterling disclosed that 80% of its overall loan portfolio was made up of residential mortgages, of which 75% were issued through the ALP.

35.     As of December 31, 2017, approximately six weeks after the IPO, ALP mortgages comprised 77% of Sterling's residential loans and approximately 63% of the Company's $2.6 billion overall loan portfolio.  By the end of 2018, Sterling's overall loan portfolio increased to $2.9 billion, of which the ALP was responsible for 68%.  In the first three quarters of 2019, the ALP generated 83% of Sterling's residential loan production, roughly 72% of the Company's loan assets.

36.     Sterling attributed the success of the ALP to the substantial "continuity and institutional knowledge" of its loan underwriting team.  The program's leadership was comprised of senior managers who, by 2017, had already worked for the Company for more than 16 years, on average.  According to the Offering Statement, the Company's corporate culture "emphasize[d] the values of personal relationships and quality customer service."  Sterling required its loan officers to meet in-person with each prospective ALP borrower and "produce a narrative documentation recommending the loan."  Consequently, its experienced employees acquired "extensive knowledge of [Sterling's] customers," enabling the Company to identify mortgage solutions that fit customers' specific needs.

37.    The ALP was especially valuable because loans issued through the program "historically generated larger margins than traditional conforming mortgage products."  Moreover, through the ALP, Sterling reached a large, specific market—prospective borrowers that do not qualify for traditional mortgages—for which there was minimal competition, giving the Company a leg up in marketing its other products and services.  More than 98% of ALP customers also had deposit accounts at Sterling's local branches, helping the Company increase its deposits from approximately $950 million to nearly $2.5 billion during the four-year period ending December 31, 2018.

38.    Such a high concentration of adjustable-rate mortgages issued to borrowers with limited credit histories typically signals poor credit quality and substantial risk for lenders.  Sterling assured investors that its residential loan portfolio was nevertheless relatively low risk due to uncommonly rigorous policies and controls and a strong corporate culture featuring disciplined underwriting and a personal touch.

39.    Specifically, Sterling disclosed that its collection of loan assets was supported by "disciplined documentation of ability to repay, liquidity analysis and face-to-face customer interaction."  The Company explained that it refuses to "provide [its] key loan products to any customer unless the applicable relationship manager has met them and documented the interaction."  Sterling elaborated:

We work directly with our borrowers and third parties to confirm their credit status and ability to repay and offer our borrowers the opportunity to expand their credit history through what is often a first-time mortgage for the customer, while requiring a minimum down payment of 35% on our key residential loan programs.  We believe the resulting low loan to value ratios, which averaged 60%, in our core residential product portfolio, protects our position while enabling the customer to manage smaller overall monthly payments than would otherwise be available with a low down payment, traditional qualified mortgage.

40.     According to the Offering Statement, the depositary relationships that Sterling forged with ALP customers gave the Company "visibility into their liquidity profile" and consequently a unique means of managing asset quality. Sterling asserted that personal involvement by experienced loan officers, combined with their "disciplined and conservative underwriting approach," helped account for the Company's "responsible growth" and "strong asset quality," as reflected by a 0.06% rate of delinquency as of September 30, 2017.  The Company further boasted that it had "established a culture that places credit responsibility with individual loan officers and management and does not rely solely on a loan committee and institutional experience to remain disciplined in our underwriting."

41.     Sterling repeated many of these disclosures in its annual financial reports for the years ending December 31, 2017 and December 31, 2018.

42.     In quarterly earnings releases and calls with analysts, Sterling executives regularly touted the high quality of the Company's residential loan assets.  For instance, on the January 30, 2018 earnings call, President, Chief

Operating Officer, and Chief Financial Officer ("CFO") Thomas Lopp ("Lopp")
and Chairman of the Board and Chief Executive Officer ("CEO") Gary Judd
("Judd") repeatedly referred to the assets' "pristine credit quality" and the bank's
"strong credit culture."  Judd asserted that the Company was well-served by the
remoteness of Sterling's corporate headquarters in Michigan from its primary
branch operations in California:

> [W]e operate in a highly efficient manner, having our back office
> operations located in Michigan, a lower cost region of the country, is a
> huge competitive advantage and contributes to our industry-leading
> operating efficiency metrics from institutions of our size. Our
> customer-facing personnel in our markets are able to focus on
> growing deposit relationships, producing loans and serving our
> customers.

43.    On an October 29, 2018 earnings call, President of Commercial and
Retail Banking and Chief Lending Officer Michael Montemayor ("Montemayor")
discussed the success Sterling was enjoying in the markets where the ALP was a
primary focus.  He noted that, barely three years after Sterling entered the Greater
Los Angeles area, that region accounted for nearly half of Sterling's overall loan
production and, in light of an upcoming branch opening in Koreatown, further
growth appeared probable.  He shared the Company's formula for success in
California: a "highly responsive and efficient underwriting process for residential
mortgages, which often enables us to close loans in half the time it takes our
competition."

44.     Management disclosed that Sterling's expansion to New York was also going very well during the second half of 2018.  On a January 29, 2019 earnings call, Lopp reported that "New York has actually been very favorable on the loan side.  They're starting to produce a meaningful percentage of the total." He again referred to an uptick in loan production in New York on the Company's April 29, 2019 earnings call.

**The OCC Investigation and Agreement Finally Come to Light**

45.     The production increase in New York in 2018 and early 2019 was contemporaneous with a decrease in production in San Francisco, which management routinely attributed to exacerbating trade tensions between the U.S. and China.   The Company remained silent regarding an ongoing OCC investigation of the ALP and the investigation's impact on loan origination in the Asian communities the ALP was designed to target.

46.     On June 21, 2019, Sterling filed with the SEC a Form 8-K announcing that the Company had entered an agreement with the OCC, dated June 18, 2019 (the "OCC Agreement"), "relating primarily to certain aspects of [Sterling] Bank's Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') compliance program. The Agreement generally requires that the Bank enhance its policies and procedures to ensure compliance with BSA/AML laws and regulations."

47.    Sterling reassured investors that the "Company does not believe that the Agreement will have any material impact on its performance metrics, the payment of dividends, or the current share repurchase program."   The brief disclosure did not mention any concerns raised by the OCC regarding Sterling's loan underwriting practices.

48.    In Sterling's ensuing earnings release, published on July 29, 2019, the Company did not discuss the OCC Agreement.   Judd reassured investors, "[w]e expect to resume our loan growth as our pipeline is healthy and credit quality remains excellent, which should translate into continued strong returns for our shareholders[.]"

49.    On a call with analysts later that day, Judd extolled the "outstanding quality and performance of the loans we originate" and reported that Sterling intended to continue to repurchase stock because the then-current market price – approximately $9.90 per share – reflected "a significant discount to fair value." Judd and Lopp each mentioned that Sterling anticipated a minor increase in expenses for regulatory compliance, but neither executive otherwise made reference to the OCC Agreement or the OCC's specific concerns.

50.    Sterling did not publish the OCC Agreement itself until it appended the document as an exhibit to its August 9, 2019 Form 10-Q.   The Form 10-Q contained no further discussion of the OCC Agreement nor any related

investigation.  The filing included the same disclosures regarding management's evaluation of the effectiveness of the Company's disclosure controls and procedures that were present in Sterling's previous quarterly reports.  Similarly, as in prior filings, the Form 10-Q reassured investors that "[t]here were no changes in the Company's internal control over financial reporting . . . that occurred during the three months ended June 30, 2019 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."

51.    At last available to investors, the OCC Agreement made clear that the OCC had informed Sterling about numerous violations of law when the OCC delivered to Sterling a Report of Examination.  The Report of Examination identified corrective actions necessary to remedy, among other things, flaws in the Company's model risk management and monitoring of lending activity.  The OCC Agreement revealed that, despite Sterling's awareness of these problems, the violations remained uncured and undisclosed to shareholders.

52.    The OCC Agreement featured an entire section regarding Sterling's residential real estate loan underwriting practices.  The OCC Agreement required the Board to revise the Company's "policies and procedures to ensure effective controls over loan underwriting" and submit those changes for OCC approval by

September 16, 2019.  The OCC Agreement specifically identified the following items as needing revision:

> (a) effective controls and processes to collect and verify employment and income;
>
> (b) verification of borrowers' ability to repay indebtedness in a timely manner;
>
> (c) verification of borrowers' income and cash flow information used in Sterling Bank's underwriting process for non-owner occupied properties;
>
> (d) effective controls and verification procedures for the acceptance of gift letters, including proper execution and endorsement by both the donor and recipient; and
>
> (e) effective oversight of exceptions identified by Sterling Bank's quality control function, including proper escalation and disposition of concerns raised by quality control to management or the BSA Officer.

53.     The OCC Agreement further required that a Compliance Committee, to be formed by the Board pursuant to the OCC Agreement, submit to the Board (and subsequently to the OCC) quarterly written progress reports regarding Sterling's "specific corrective actions undertaken to comply with each Article of this Agreement."  The OCC Agreement established deadlines of September 30, 2019 and October 30, 2019 for the first two such reports.

54.     On October 17, 2019, the Company announced that Judd intended to retire from his roles as Chairman and CEO, effective November 30, 2019.  In the press release, Judd again praised Sterling's "strong credit culture, and very efficient back-office operations."  The Board selected Lopp, the Company's long-

time CFO who had spearheaded the bank's expansion into Southern California, to assume the reins from Judd.

55.   Sterling issued its next quarterly earnings release on October 28, 2019.   Again, the Company declined to provide further disclosure regarding its communications with the OCC.   Management continued to attribute new trends in financial performance to benign causes.   Sterling explained that its recent decrease in loan origination occurred because the Company had "maintained [its] underwriting and pricing discipline in a very competitive lending market."

56.   The closest Sterling came to hinting that the impact of the OCC investigation might be greater than the Company had previously signaled was Judd's statement that Sterling "may significantly reduce" loan sales in the next quarter.   Any suspicions this comment may have prompted regarding a decline in asset quality were washed away when, on a call with analysts later that day, Judd touted the "high quality of the loans we originate" and Sterling's "healthy loan pipeline."   Lopp affirmed that the Company would continue to repurchase shares because, at $10 per share, Sterling shares were then "trad[ing] at a significant discount to fair value."

57.   Sterling waited more than ten days before making meaningful new disclosure regarding its ALP crisis.   A Form 10-Q filed on November 8, 2019, reported that the management had fired the program's top two loan producers, who

were "collectively responsible for 15% of our residential loan production through September 30, 2019." Sterling stated that it would attempt "to retain their clients and replace their historical production with new production from existing or new loan producers."

58.    The filing otherwise contained no new information regarding the investigation into the ALP. Instead, it continued the Company's practice of disclosing each quarter that "[t]he Company's management, including the Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of the Company's disclosure controls and procedures" and that, "[b]ased on this evaluation, the Company's Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of" the quarter's end. Like prior quarterly reports, the filing reassured investors that "[t]here were no changes in the Company's internal control over financial reporting . . . that occurred during the three months ended September 30, 2019 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."

59.    The Company did not let on that the entire foundation of the ALP—as opposed to just two bad apples—was rotten until December 9, 2019. On that date, Sterling began rolling out a series of increasingly troubling disclosures regarding the quality of the documentation of loans in its Advantage Loan portfolio and the

Company's systems and controls for originating those loans.  Five days **after** the trustee to the Seligman family sold 400,000 shares for $9.48 per share, Sterling filed with the SEC a Form 8-K disclosing that the Company was voluntarily and temporarily suspending the ALP to conduct a long-overdue internal review of documentation for past loans and compliance with the Company's loan origination policies and procedures under the program.  Even as it took this major step, the Company downplayed its potential impact, stating that while "management anticipates a reduced level of near-term loan originations, slower overall loan portfolio growth, and less loan sales . . . management does not anticipate any credit related issues from previous loans made under the program . . . ."

60.    Still, the December 9, 2019 disclosure triggered an immediate 22.86% drop in the trading price of Sterling common shares, from $9.45 per share at closing on Friday, December 6, 2019, to a closing price of $7.29 per share on Monday, December 9, 2019.

61.    On December 17, 2019, Tom Minielly, less than six months into his tenure as a Sterling director, resigned from the Board, effective immediately, citing "personal reasons."

62.    After the close of trading on March 6, 2020, Sterling filed with the SEC a Form 8-K announcing its intention to permanently shutter the ALP. Sterling explained that a special committee of its board of directors had found

evidence of misconduct by a "significant number" of employees and executives responsible for loan origination, "including with respect to income verification and requirements, reliance on third parties, and related documentation."   Sterling additionally disclosed that the Company was under formal investigation by both the OCC and the DOJ, and that the Company would not be able to timely file its Annual Report with the SEC.   These disclosures caused the market price of Sterling common stock to suffer a single-day decline of 26.84%, from $6.67 per share at closing on Friday, March 6, 2020 to $4.88 per share at closing on Monday, March 9, 2020.

63.   Sterling's stock price declined even more precipitously approximately one week later.   On March 17, 2020, Sterling filed a Form 12b-25 advising the SEC that the Company did not expect to complete its internal review of the Advantage Loan program and loans in time for Sterling to meet a fifteen-day extended deadline for filing its Annual Report.   The price of Sterling shares dipped from $4.54 per share at closing on March 17, 2020 to just $2.94 when trading ended the following day, reflecting a 35.24% decline.   At close on March 18, 2020, the market price of Sterling shares was less than one-third of what it had been barely four months earlier.

64.     By letter dated May 7, 2020, Lopp resigned from his positions as President and CEO of the Company, effective immediately.  He also resigned from the Board.  He informed the Company that he was leaving "for health reasons."

65.     On May 12, 2020, Sterling filed a Form 12b-25 advising the SEC that the Company did not expect to complete its internal review of the Advantage Loan program and loans in time for Sterling to meet a seven-day extended deadline for filing its first-quarter Quarterly Report.  Sterling made a similar filing on August 11, 2020, regarding its inability to timely file its second-quarter Quarterly Report.

66.     The next big shoe to drop was the Company's May 29, 2020 Form 8-K announcing the termination of Montemayor from all of his positions, effective immediately.

67.     Three days later, on June 1, 2020, the Company filed a Form 8-K in which it disclosed that, in the course of its internal review of the ALP, "it has become apparent that the potential for liability related to the origination of residential mortgage loans under that program warrants the initial creation of reserves."  Sterling repeated its recent disclosure that the internal review, while still ongoing, additionally "indicate[d] that certain employees engaged in misconduct in connection with the origination of loans, including with respect to verification of income, the amount of income reported for borrowers, reliance on third parties, and related documentation."

68.     In the June 1, 2020 filing, the Company announced that it had agreed to hire Thomas O'Brien ("O'Brien") as its new Chairman, CEO, and President, subject to the receipt of regulatory non-objection from the OCC.  Excepting the counsel he provided as a consultant to the Company beginning in March 2020, O'Brien was the first executive that Sterling hired from outside the Company in at least a decade.

69.     On August 22, 2020, the Board increased its size from nine to eleven directors and appointed Denny Kim ("Kim") and Steven Gallotta ("Gallotta") as its newest members, subject to the receipt of regulatory non-objection from the OCC. The Company simultaneously disclosed that, on August 18, 2020, Stewart notified Sterling that, for personal reasons, she opted not to seek re-election at the end of her term, which was due to expire at the upcoming annual shareholder meeting on November 18, 2020.

70.     On October 6, 2020, Sterling filed its annual report on Form 10-K for the year ending December 31, 2019.  The Company disclosed that the internal review of the ALP being conducted by a special committee of its independent directors was at last substantially complete.  Sterling disclosed that:

> [M]isconduct of employees discovered during the Internal Review has resulted in a material adverse impact on our business and results of operations through the expenditure of significant expenses on third parties and the expenditure of significant internal resources for the conduct of the Internal Review, damage to our reputation, termination of a core part of our operating model, and a number of additional

material risks identified in the Risk Factors set forth below. In addition, if further work is required in connection with the Internal Review, management's time and resources could be diverted, and we may incur significant legal and other expenses in connection with such additional work.

Sterling further disclosed that, during the past year, more than 100 officers and employees, including more than 35 loan officers, had resigned or been terminated in connection with the internal review, and that investigations by the OCC and DOJ remained ongoing.

71.     Sterling newly reported that, beginning late in the second quarter of 2020, the Company commenced making offers to repurchase all of the ALP loans it had previously sold to third party investors.  The Company advised that because it had sold many of those loans at a premium to their principal balances, it expected to incur losses as a result of its repurchases.  The repurchases were likely to sap any excess liquidity that had been built up by the Company.

72.     As of its latest filing, Sterling had repurchased $167.8 million of ALP loans in the first half of 2021 and committed to buy back another $93.8 million of ALP loans over the next two years.

73.     In contrast to previous financial reporting by the Company, the Form 10-K acknowledged that the Board "identified material weaknesses in the Company's internal control over financial reporting related to our control environment, including contributing factors involving our organizational structure

and reporting lines and the staffing of our internal control function, as well as our identification and assessment of risks in the Advantage Loan Program." The revamped management team determined that the Company failed to maintain effective internal control over its financial reporting as of December 31, 2019.

74.     On December 11, 2020, just one week after Stewart's departure for "personal reasons," Allen resigned from the Board, effective at the end of the year.

**The DOJ Investigation Reveals that Defendant Executives Knew About and Encouraged Habitual Fraud in the ALP**

75.     In early 2021, criminal information statements and plea agreements were filed, including in this District, against former Sterling loan officers. These documents constituted the first publicly-disclosed fruits of the DOJ's years-long investigation into misconduct relating to residential lending in the ALP.

76.     On January 26, 2021, Hao Liang Hu ("Hu"), a Sterling loan officer based in the Greater Los Angeles area, pled guilty to conspiracy to commit wire and bank fraud in violation of 18 U.S.C. § 1349. The information statement relating to the charge described how Sterling's loan originators performed their work at local branches in San Francisco, Los Angeles, New York, and Seattle, hundreds of miles away from Southfield, Michigan, where the majority of the Company's senior management, underwriting group, and quality control division were located. Motivated by Sterling's commission-based compensation structure, by which officers and employees earned more income by increasing the total dollar

volume of the residential loans they originated, Hu, his colleagues, and his supervisors were easily able to abuse the Company's weakly enforced underwriting guidelines.

77.    Sterling Bank underwriters relied heavily on customers' loan applications and other mortgage-related documents prepared by borrowers with loan officers' assistance.  Beginning at least as early as 2015, Hu and numerous co-workers routinely "falsified [loan applications]; . . . created false and fictitious supporting documents, including verification of employment letters, gift letters, face-to-face interview narratives, and letters of explanation; and . . . falsified borrowers' income and debt-to-income ratios in order to make it appear that borrowers qualified for residential loans."

78.    To conceal the origin of the funds that borrowers used as down payments for their mortgages, Hu and his colleagues advised applicants to transfer funds to third parties, who would then launder the funds back to the borrowers by disguising such funds as "gifts."  In this way, Hu facilitated the use of the ALP as a means of providing loans to borrowers involved in money laundering and tax evasion.

79.    Over a four-year period, Hu personally originated approximately 825 ALP loans, totaling approximately $500 million.  According to his plea agreement, the vast majority of these loans were fraudulent.

80.     Hu conspired with his supervisor, Yihou Han ("Han"), who pled guilty to conspiracy to commit bank fraud and wire fraud in violation of 18 U.S.C. § 1349 on April 14, 2021.  Han joined Sterling as a bank teller in 2009, became a loan officer in 2011, and was promoted to the position of senior loan officer in 2016.  Over the course of eight years, Han originated at least 1,288 residential mortgages through the ALP, representing at least $683,535,305 in credit.  Having established herself as the Company's top-performing loan officer, she was promoted to vice president in 2017 and appointed as Managing Director for Residential Lending in 2018.  In this final role, Han was responsible for overseeing Sterling's residential lending operations in New York, contemporaneous with the Company's sharp increase in loan originations in that region.

81.     Prior to her termination from the Company in November 2019, Han established herself as favorite of several key Sterling executives.  Although the charging documents refrain from calling them out by name, the identification of job titles makes clear that Han worked closely with Montemayor, Lopp, and Scott Seligman.   Her plea agreement states that, with their "knowledge and encouragement," Han "falsified documents and material information about borrowers' qualifications for the Advantage Loan Program, and concealed material information about borrowers from [Sterling's] Underwriting Department, in order to increase the volume of loans originated under the Advantage Loan Program

which, in turn, increased the Bank's revenue and their personal commissions."
Additionally, Han "and her co-conspirators knowingly provided Advantage Loan
Program loans to borrowers involved in money laundering and tax-evasion
activity."

82.     Han engaged in the unlawful activity with the full knowledge of
Montemayor, Lopp, and Scott Seligman, and with the intent to provide them and
the Company with improper benefits.   Han regularly attended meetings with
Montemayor, Lopp, Scott Seligman, other executives, and even regulators and
investors, concerning the performance of the ALP.   The executives hand-picked
her to develop and expand the ALP into new markets and directed her to hire, train,
and mentor dozens of loan officers throughout the Company's operations.

83.     Several months have passed since the DOJ's allegations became
public, but Sterling has yet to disclose whether and to what extent its independent
directors determined that Scott Seligman encouraged fraudulent ALP-related
misconduct.  Scott Seligman resigned from his positions as consulting director to
the board of Sterling Bank and as vice president of the Company effective
December 31, 2019, but remains the Company's most powerful stockholder.

## DERIVATIVE AND DEMAND ALLEGATIONS

84.     Plaintiff brings this action derivatively in the right and for the benefit of Sterling to redress the breaches of fiduciary duty and other violations of law by Defendants.

85.     Plaintiff will adequately and fairly represent the interests of Sterling and its shareholders in enforcing and prosecuting its rights.

86.     On July 28, 2020, pursuant to MCL § 450.1493a, Plaintiff made a demand on the Board to commence an action against certain current and/or former directors and executive officers of the Company (the "Demand"), a true and correct copy of which is attached hereto at Exhibit A.

87.     On September 22, 2020, the Board established a demand review committee (the "Demand Review Committee") to evaluate the matters raised in the Demand and to determine whether any actions should be taken by the Company with respect to those matters.   The Board selected for the Demand Review Committee directors O'Brien, Kim, and Gallotta, all of whom joined the Board after the misconduct alleged in the Demand.

88.     On October 5, 2020, the Demand Review Committee, through its counsel, acknowledged receipt of the Demand and sought Plaintiff's agreement to extend the 90-day response period under MCL § 450.1493a to allow the Demand Review Committee time to complete its work.

89.     Before completing its work, the Demand Review Committee contacted counsel for Plaintiff to initiate negotiations of a potential settlement.

90.     The parties conducted negotiations over the course of several months and ultimately reached agreement on and executed a term sheet.

91.     The parties intend to execute a formal stipulation of settlement and file with this Court a motion for preliminary approval of settlement as soon as reasonably practicable.

## COUNT I

## AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

92.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

93.     As directors of the Company, the Individual Defendants owed fiduciary duties to Sterling during the period in which they engaged in the activity described herein.   By reason of their fiduciary relationships, the Individual Defendants specifically owed Sterling the highest obligation of good faith, loyalty, and due care in the administration of the affairs of the Company.

94.     The Individual Defendants breached their fiduciary duties by abdicating their responsibility to make a good faith effort to oversee the Company's operations, internal controls, and accounting and financial reporting practices.

95.    As a direct and proximate result of the Individual Defendants'

breaches of fiduciary duty, Sterling sustained damages.

96.    Plaintiff has no adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment in his and Sterling's favor and

against the Individual Defendants:

A. Declaring that this action is properly maintainable as a derivative action,

B. Awarding Sterling damages, including pre- and post-judgment interest,

C. Awarding appropriate equitable relief,

D. Awarding Plaintiff the costs and disbursements of the Action, including
   reasonable attorneys' and experts' fees, and

E. Granting such other and further relief as the Court deems just, proper and
   equitable.

DATED: January  20, 2022

OF COUNSEL:

**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
Eric L. Zagar
Matthew Benedict
Karen Kam
280 King of Prussia Road
Radnor, Pennsylvania 19087
Tel: (610) 667-7706

**ANTHONY L. DeLUCA, PLC**

/s/ *Anthony DeLuca*
Anthony DeLuca (P-64874)
14950 East Jefferson Avenue, Ste 170
Grosse Pointe Park, MI 48230
Tel: (313) 821-5905
anthony@aldplc.com

**GLANCY PRONGAY & MURRAY LLP**
Benjamin I. Sachs-Michaels
712 Fifth Avenue, 31st Floor
New York, NY 10019
Tel: (212) 935-7400

*Attorneys for Plaintiff*